UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


HEIDI DIAS,
     Plaintiff,

                                         CIVIL ACTION NO.
     v.                              13-10662-MBB

CAROLYN W. COLVIN, Acting
Commissioner of Social Security
     Defendant.


**MEMORANDUM AND ORDER RE:**
**MOTION TO REVERSE (DOCKET ENTRY # 17);**
**DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S**
**DECISION (DOCKET ENTRY # 21)**

**September 30, 2014**


**BOWLER, U.S.M.J.**

Pending before this court is a motion by plaintiff Heidi

Dias ("plaintiff") seeking to reverse the decision of defendant

Carolyn W. Colvin, Acting Commissioner of the Social Security

Administration (the "Commissioner"). (Docket Entry # 17).

Defendant moves for an order affirming the decision. (Docket

Entry # 21).

<u>PROCEDURAL HISTORY</u>

Plaintiff filed an application for supplemental security

income ("SSI") on September 16, 2010. (Tr. 140-46). She

alleged a disability due to "anorexia/depression/suicide

attempts/panic attacks" and "drug addiction/on methadone." (Tr. 151, 155). The Social Security Administration interviewer that day did not observe that plaintiff had any visible sign of impairment or any perceived difficulty standing or walking. (Tr. 152).

Plaintiff's claim was denied on December 3, 2010, and again upon reconsideration on April 29, 2011. (Tr. 62, 71). On May 5, 2011, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 74-75).

On February 28, 2012, the ALJ held a hearing on plaintiff's application for SSI. (Tr. 11, 22-59). On March 8, 2012, the ALJ issued an opinion finding plaintiff not disabled. (Tr. 8). On February 4, 2013, the Appeals Council denied plaintiff's request for review of the March 8, 2012 decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5). Plaintiff, through counsel, seeks review by this court pursuant to 42 U.S.C. § 405(g).

## FACTUAL HISTORY

I. Medical History

A. Depression and Substance Abuse

Plaintiff was born on January 2, 1979. In the application, plaintiff submits that her disabling condition began on January 1, 2008, when she was 31 years old. (Tr. 155). Plaintiff has a high school education and is not married. Her relevant work

experience includes work as a waitress, cashier and cleaner. (Tr. 26, 156, 163-69).

Plaintiff has a history of depression and substance abuse. In March 2006, in connection with plaintiff's application for state disability benefits, a reviewer at the University of Massachusetts Medical School's Disability Evaluation Services ("DES") found that plaintiff exhibited six characteristics associated with "depressive syndrome"[1] which resulted in "marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; [and] repeated episodes of decompenstation." (Tr. 567-68).

In November 2006, plaintiff informed her primary care physician, Amy Esdale, M.D. ("Dr. Esdale"), that she had a history of depression, anxiety and anorexia. (Tr. 236). Among other complaints, plaintiff told Dr. Esdale that she experienced racing thoughts all the time and constant thoughts about illness. (Tr. 256). Dr. Esdale prescribed several medications in an attempt to treat plaintiff's complaints including Celexa, Wellbutrin, Seroquel and Clonidine.[2] (Tr. 234-73).

_____

[1] The six characteristics found by the reviewer include: "anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; decreased energy; feelings of guilt or worthlessness; [and] difficulty concentrating or thinking." (Tr. 567).
[2] The record indicates that Dr. Esdale first prescribed Celexa, Welbutrin and Seroquel for plaintiff on August 28, 2007. (Tr.

3

Additionally, plaintiff underwent inpatient substance abuse treatment from September 12 until October 13, 2006, in the Discover Program at Addison Gilbert Hospital ("AGH") in Gloucester, Massachusetts. (Tr. 435-45). From October 2006 until April 2007, she continued to receive care on an outpatient basis at Northeast Health Systems, Inc. for substance abuse. (Tr. 446-68). On April 23, 2007, plaintiff was readmitted to the Discover Program before dropping out three days later on April 27, 2007. (Tr. 423-34).

On May 29, 2008, plaintiff was seen in the emergency department at AGH for anxiety symptoms. (Tr. 514-15). Plaintiff stated that she could not take the stress she was under and felt like she was going to have a nervous breakdown. (Tr. 514). Plaintiff also stated she had been taking Paxil and Celexa, but had stopped because they were not working. (Tr. 514). She also reported that she occasionally used tobacco and alcohol and "denie[d] any drug use." (Tr. 514). The physician that treated plaintiff assessed "acute anxiety and stress reaction" and prescribed Ativan and ibuprofen before releasing plaintiff. (Tr. 514).

From February 2008 through October 2011, plaintiff received periodic substance abuse counseling and outpatient methadone

---

254-55). Dr. Esdale also noted that plaintiff had previously taken these medications. (Tr. 255). Dr. Esdale first prescribed plaintiff Clonidine on November 9, 2007. (Tr. 258).

treatment at both CAB Heath and Recovery Services ("CAB") in
Danvers, Massachusetts and Health and Education Services in
Beverly, Massachusetts.[3] (Tr. 305-57, 376-408, 614-37, 638-805).
At CAB, plaintiff received therapy from Kathy O'Neill
("O'Neill"), a licensed mental health counselor, for addiction
and anxiety. (Tr. 315-30, 353-57, 614-20, 633-36). When
plaintiff began her therapy with O'Neill in March 2010,
plaintiff reported she was on Zoloft and Ambilify for depression
and anxiety and that her life had been "unmanageable due to
depression and drug use." (Tr. 330). Throughout the next
several months, plaintiff told O'Neill that she was feeling
hopeful about her treatment, reported decreased symptoms of
anxiety and depression and stated that her medication appeared
to be working. (Tr. 315-30, 633-36). On May 4, 2010, plaintiff
reported "a reduction of symptoms of depression and anxiety" to
O'Neill. (Tr. 328). On May 18, 2010, she "presented" herself
"as somewhat depressed" but "report[ed] that she feels a little
better than normal." (Tr. 326). By October 2010, plaintiff
reported that her anti-depressants were working and that she was
able "to take care of items and paperwork" that she previously
would not have been able to complete. (Tr. 354, 636). A

---

[3] Specifically, plaintiff's medical records indicate that she
sought treatment at CAB from August 11, 2009 to November 22,
2010 and Health and Education Services from February 27, 2008 to
October 17, 2011. (Tr. 614-37, 638-805).

November 2010 report from plaintiff's final meeting with O'Neill indicates that she "recently produced an illicit free drug screen" and that her medication "appears to have alleviated some of [her] severe depression symptoms." (Tr. 633).

Plaintiff began treatment at Health and Education Services on October 27, 2010 and was treated by Debra A. Olszewski, M.S. ("Olszewski"). (Tr. 710-19). From November 2010 until January 2011 Olszewski continuously notes "slight improvement" regarding plaintiff's progress towards her goals and periodically notes that plaintiff admits to some depression and crying. (Tr. 699-709). From January to April 2011, Olszewski noted that plaintiff struggled with her drug use and depression. (Tr. 669-98). By May 2011, however, plaintiff told Olszewski she was "doing better" and that she was "at peace." (Tr. 661, 668). By July 2011, plaintiff reported to Olszewski that she "was proud of how well she was doing" and that she was feeling less depressed, more motivated and generally more positive. (Tr. 651-654). Moreover, from October 2011 through January 2012, plaintiff's psychiatrist, Roderick Anscombe, M.D., ("Dr. Anscombe"), reported that plaintiff believed "[e]verything is going well right now" and that plaintiff was "doing well on current medications." (Tr. 865-872).

B.  Right Ankle Injury

Plaintiff first reported left ankle pain on May 24, 2007, at AGH.[4] (Tr. 412). She told the treating staff member that it was an "old injury" and that she treated it by wearing support shoes and taking ibuprofen. (Tr. 412). Plaintiff denied any musculoskeletal injuries except for the ankle injury. (Tr. 414). On May 31, 2007, plaintiff complained to her primary care physician, Dr. Esdale, of right foot pain that had started five days earlier. (Tr. 249). Dr. Esdale reported "No trauma. Mild swelling no redness . . . [patient] has been wearing shoes with no support." (Tr. 249).

On March 22, 2011, plaintiff completed a function report for the Social Security Administration in connection with her disability claim. (Tr. 200-07). The report focused on her mental state. When asked to check various boxes that her condition affected, she did not check the boxes applicable to her ability to walk, stand, lift or climb stairs. (Tr. 205).

On January 25, 2012, plaintiff was again treated for right ankle pain. (Tr. 845). Plaintiff told Kyan Berger, M.D. ("Dr. Berger") that she "had [an] injury sometime ago and she has had persistent chronic right ankle pain" that was made worse when she slipped and twisted her ankle in the snow four or five days prior to her visit. (Tr. 845). An X-ray taken the same day

---

[4] The reference to a left ankle injury in plaintiff's chart at AGH may be an error. Subsequent medical records consistently indentify plaintiff's right ankle as the source of her pain.

revealed "no ankle fracture," according to the radiologist's report. (Tr. 812). Dr. Berger's review of the X-ray "show[ed] no acute abnormalities." (Tr. 845). Upon examining the ankle, Dr. Berger found "no redness, swelling, or deformity." (Tr. 845). He also found, "No significant tenderness except possible mild lateral malleolar tenderness" at one location. (Tr. 845). Plaintiff also informed Dr. Berger that she would not need a cane or walker. (Tr. 845). Dr. Berger diagnosed a right ankle sprain and an "acute exacerbation of chronic ankle pain." (Tr. 845). He instructed plaintiff to take ibuprofen and gave her an air cast. (Tr. 845).

On February 1, 2012, plaintiff sought follow up treatment at the Gloucester Family Health Center in Gloucester, Massachusetts. (Tr. 807). Plaintiff reported chronic right ankle pain and informed Kathryn Hollett, M.D. ("Dr. Hollett") that she had stepped in a hole seven years ago while wearing high heels and experienced severe pain in her right ankle. (Tr. 807). Plaintiff reported that she sought treatment three years after the injury and "was told that her xray [sic] showed an old fracture." (Tr. 807). Dr. Hollett noted that the X-ray taken the previous week was normal. (Tr. 807). Although plaintiff reported ankle tenderness, Dr. Hollett's examination noted that plaintiff's ankle had a full range of motion, no instability and no swelling. (Tr. 808). Dr. Hollett's impression was that

plaintiff had a right ankle sprain, obesity and joint pain in
her ankle and foot.  Dr. Hollett recommended plaintiff take
Tylenol or ibuprofen to relieve the tenderness, encouraged her
to wear proper footwear and ordered physical therapy.  (Tr.
808).

II.  ALJ Hearing

In plaintiff's application for SSI benefits, plaintiff
claimed she was disabled as of January 1, 2008, citing mental
illness and substance abuse as reasons for the disability.
(Tr. 151, 155).  At the hearing before the ALJ, plaintiff
testified that depression, anxiety and her ankle injury were the
major factors in her disability.  (Tr. 27-29).

At the start of the hearing, plaintiff summarized her work
experience as a cashier at Market Basket.  (Tr. 27).  Plaintiff
explained that after about ten months working there, she quit
because:

> [I]t was very hard for me to be able to just get up and
> really go to work . . . I was getting up everyday to go,
> but there was times where I just—just didn't . . . Also,
> another thing that made it hard for me was the long period
> of time they had me standing . . . I have ankle issues . .
> . and it was, you know, it throbbed when I standed [sic] for
> a long period of time, and it just—it really made it hard
> for me, to you know, want to go in the next day, and I was—
> I became very hard on myself, you know, about—you know,
> being able to follow through.

(Tr. 27-28).  Plaintiff then told the ALJ that after quitting
the cashier position at Market Basket, she tried finding work at

a convenience store or as a waitress but did not believe that she could be a waitress at this time.  (Tr. 28-29).

When asked what brought on her anxiety, plaintiff replied, "A lot of things, my — I have a lot of things that just go through my head a lot throughout the day.  I get very nervous about my past and my present and my future."  (Tr. 33).  When the ALJ asked what doctors she was seeing, plaintiff responded that she was seeing a therapist as well as a counselor on a biweekly basis.  (Tr. 31).  Plaintiff also testified that she was taking medications for her anxiety as prescribed and that she believed they were working.  (Tr. 32).  Plaintiff stated that she experienced headaches and nausea which she thought was a result of the "depression medications" and had asked her psychiatrist to prescribe a different medication.  (Tr. 33). When asked if she makes all her appointments, plaintiff stated that she did.  (Tr. 32).  Plaintiff also testified that while she did at one point in her life abuse alcohol, she had been sober 13 years and maintained her sobriety by going to a group. (Tr. 42).

The ALJ then explored plaintiff's physical limitations. (Tr. 34).  Plaintiff described her main physical limitations as standing, jumping and running but noted that she could walk about a half mile before her right ankle would get stiff.  (Tr. 34-35).  Plaintiff also testified that despite her right ankle,

she did not use a walker or a cane for assistance, has no trouble sitting, bending, or stooping and could lift around 25 pounds without trouble. (Tr. 35). Plaintiff further stated she was able to do chores around the house including making the beds, sweeping, doing the dishes, laundry and occasionally doing the food shopping. (Tr. 36-39). Moreover, plaintiff testified that she had a gym membership and liked to do light exercise, however, her gym membership recently expired. (Tr. 36).

When plaintiff discussed her social interactions, she testified that while not having many hobbies or activities, she socializes with her family, lives with a boyfriend and often goes to her mother's home to help get her two children ready for school. (Tr. 35-50). Plaintiff described that when she does spend time with her children, she is able to do so alone, watching television together or taking them to the park. (Tr. 49-50). While plaintiff stated she did not get dressed four out of seven days a week, if she was required to go somewhere, like a doctor's appointment, the clinic or her mother's house, she would dress herself. (Tr. 36-37).

A vocational expert ("VE") also testified at the hearing. (Tr. 52). The VE testified about plaintiff's work history as a counter attendant at Dunkin' Donuts, a cashier, a cleaner, a debt collector and a waitress. (Tr. 53-55). The VE concluded that plaintiff's work history consisted of primarily light and

medium work. (Tr. 53-54). The ALJ then asked the VE if an individual with plaintiff's age, education and experience, "who is able to perform at the medium level," could perform plaintiff's past relevant work when "[w]ork is limited to simple, routine, repetitive tasks." (Tr. 56). The VE testified that such an individual could perform work as a counter attendant, a cashier and a cleaner, but not as a debt collector. (Tr. 56). The VE also noted that the DOT listed a cashier position at a supermarket as semi-skilled and other cashier positions as unskilled.[5] The VE acknowledged that he did not understand the reason for the distinction and opined that all cashier positions were unskilled. When asked to assume that plaintiff was "able to understand, remember simple information [and] perform simple tasks for two-hour periods," the VE replied that plaintiff would still be able to work. (Tr. 57-58).

DISCUSSION

I.  Jurisdiction and Standard of Review

---

[5]  DOT is an acronym for the "Dictionary of Occupational Titles," which is published by the Department of Labor. Figueroa v. Commissioner of Social Security, 2013 WL 6571933, at *3 n.7 (D.Mass. Dec. 13, 2013). The publication "'includes information about jobs (classified by their exertional and skill requirements) that exist in the national economy.'" Id. (quoting 20 C.F.R. § 416.969). "The Social Security Administration 'takes administrative notice of reliable job information available from' this publication." Id. (omitting internal brackets and quoting 20 C.F.R. § 416.966(d)).

This court has the power to enter, "upon the pleadings and the transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security with or without remanding the case for rehearing." 42 U.S.C. § 405(g). The factual findings of the Commissioner are treated as conclusive so long as they are "supported by substantial evidence." Id.; see also Astralis Condominium Ass'n v. Sec'y of Housing and Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010) ("[t]he ALJ's factual findings are binding as long as they are supported by substantial evidence in the record as a whole"); accord Manso-Pizzaro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) ("[t]he Secretary's findings of fact are conclusive if supported by substantial evidence") (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).

To be supported by substantial evidence, the Commissioner's factual findings must rely on "'more than a mere scintilla.'" Richardson v. Perales, 402 U.S. at 401 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence exists if "'a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'" Musto v. Halter, 135 F.Supp.2d 220, 225 (1st Cir. 2001) (quoting Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)). If the Commissioner's decision is supported by substantial evidence,

13

the court must defer to it even if alternative decisions are equally supported.  See Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).  The court is not bound, however, by factual findings that are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  It is therefore the task of the court to determine "whether the final decision is supported by substantial evidence and whether the correct legal standard was used."  Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001).

II.  ALJ's Disability Determination

An individual is disabled under the Social Security Act if that individual is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The medical impairment must be of such severity that the individual "is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Regulations set out a five step evaluation process for determining whether an individual is disabled.  20 C.F.R. §

416.920(a).  If an individual is disabled or not disabled at any step, the evaluation stops.  20 C.F.R. § 416.920(a)(4).  In the first four steps of the analysis, the claimant bears the burden of showing she is disabled.  <u>See</u> <u>Rohrberg v. Apfel</u>, 26 F.Supp.2d 303, 306 (D.Mass. 1998).

At the first step, if the claimant is currently employed, he or she is automatically considered not disabled.  20 C.F.R. § 416.920(b).  If the claimant is not working, the evaluation moves to the second step.  Under the second step, the ALJ determines whether the claimant has a severe impairment or combination of impairments.  20 C.F.R. § 416.920(c).  A severe impairment must meet the durational requirement of 12 months and "significantly limit[] your physical or mental ability to do basic work activities."  20 C.F.R. §§ 916.920(c), 416.909.  If the claimant has a severe impairment, the disability determination moves to the third step.  This step requires the ALJ to consider the severity of the individual's impairment by determining whether the claimant has "an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1."  <u>Goodermote v. Sec'y of Health and Human Servs.</u>, 690 F.2d 5, 6 (1st Cir. 1982); 20 C.F.R. § 416.920(d).  If the claimant has such an impairment, the claimant is considered disabled.  20 C.F.R. § 416.920(d).

Whenever the ALJ determines that the claimant has a significant impairment, but not an "Appendix 1 impairment," the evaluation moves to the fourth step where the ALJ must assess and make findings about the claimant's residual functional capacity ("RFC"). 20 C.F.R § 416.920(e). An individual's RFC is defined as "the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1). If the ALJ determines the claimant has the RFC to do past relevant work, the claimant is not disabled. Goodermote v. Sec'y of Health and Human Servs., 690 F.2d at 7; 20 C.F.R. § 416.920(a)(4)(iv). Past relevant work is "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 416.960(b)(1).

If the claimant cannot do past relevant work, then the ALJ proceeds to the fifth and final step of the analysis, where the burden shifts to the Commissioner. Rohreberg v. Apfel, 26 F.Supp.2d at 306-307. Here, the Commissioner assesses the claimant's RFC, age, education and work experience to see if the claimant can make an adjustment to do other work. 20 C.F.R. § 416.920(g). If the Commissioner can show that the claimant can adjust to another job, then the claimant is not disabled. 20 C.F.R. § 416.920(g).

Plaintiff asserts that the ALJ's decision is "not supported
by substantial evidence," particularly his finding at step four
of his evaluation.  Plaintiff contends that:  (1) the question
presented by the ALJ to the VE at the hearing was inherently
flawed and "not consistent with the medical opinion evidence or
other evidence of record"; and (2) the ALJ "ignored medical
evidence" and failed to accurately consider plaintiff's
"physical and mental impairments."  (Docket Entry # 17).

At the first step of the disability determination, the ALJ
found that plaintiff had not engaged in substantial gainful
activity since September 16, 2010.  (Tr. 13).  At the second
step, based on his consideration of the entire record, the ALJ
determined that plaintiff's depression and anxiety were a
significant impairment because they more than minimally affected
plaintiff's ability to perform work related activities.  (Tr.
13).  Regarding plaintiff's right ankle injury, however, the ALJ
found that the ankle impairment was non-severe because the
record did not support a finding that it more than minimally
affected her ability to work.  (Tr. 13).

At the third step, the ALJ considered the requirements
under 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04 and
12.06.  See 20 C.F.R. §§ 416.920(d), 916.925, 916.926.  The ALJ
determined that plaintiff did not have an impairment or
combination of impairments that met the requirements of a listed

17

affective or anxiety related disorder.  To meet or medically

equal listing 12.04 for an affective disorder and listing 12.06

for an anxiety related disorder, the claimant "must satisfy the

criteria for Paragraph A, and either the criteria of Paragraph B

or the criteria of Paragraph C."  Phaneuf v. Colvin, 2014 WL

2864727, at *6 (D.N.H. June 24, 2014); Coppola v. Colvin, 2014

WL 677138, at *3 (D.N.H. Feb. 21, 2014); see 20 C.F.R. Part 404,

Subpart P, Appendix 1, §§ 12.04 and 12.06.

   Under paragraph B for an affective or anxiety related

disorder, plaintiff must establish at least two of the

following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04.  The rating

"Marked" is applied using a "five-point scale:  None, mild,

moderate, marked, and extreme."  20 C.F.R. § 416.920a(c).  The

ALJ determined that plaintiff did not satisfy either paragraph B

or C.  The ALJ found that plaintiff had mild to moderate

difficulties in the activities of daily living, mild

difficulties in social functioning and moderate difficulties in

concentration, persistence or pace.  (Tr. 14).  Additionally,

the ALJ determined that plaintiff experienced no periods of

decompensation of extended duration. (Tr. 14). The ALJ noted that no treating or examining physician found that plaintiff had a mental impairment that met or was equivalent in severity to a listed mental disorder. Moreover, the ALJ recognized that two agency medical consultants, Mary Ellen Menken, Ph.D. ("Dr. Menken"), who completed plaintiff's initial evaluation, and Stacey Fiore, Psy.D. ("Fiore"), who affirmed Dr. Menken's initial evaluation, did not find that plaintiff's functional limitations were marked or otherwise met the requisite severity of a listed medical disorder. Dr. Menken made her findings by completing a psychiatric review technique form. (Tr. 14, 372, 409).

At step four, the ALJ found that plaintiff had the RFC to perform medium work with the exception that plaintiff would be limited to the performance of simple, routine and repetitive tasks. (Tr. 15). Additionally, the ALJ found that, in light of plaintiff's RFC and the testimony of the VE, plaintiff was able to perform her past work as a cleaner, a counter attendant and a cashier. (Tr. 19).

The ALJ classifies "the physical exertion requirements of work in the national economy" and designates jobs "as sedentary, light, medium, heavy, and very heavy." 20 C.F.R. § 416.967. "Medium work" is defined to involve "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects

weighing up to 25 pounds." 20 C.F.R. § 416.967(c). In
addition, if a plaintiff "can do medium work . . . he or she can
also do sedentary and light work." 20 C.F.R. § 416.967(c).

A. Physical Limitations

With respect to plaintiff's right ankle injury, plaintiff
submits that the ALJ erred when he determined that she did not
have a severe physical impairment at step two. He then
compounded this error at step four when he found no functional
limitations in the RFC regarding the ankle impairment and made
the determination without guidance from any medical source,
according to plaintiff. Plaintiff contends that the error was
not harmless because the ALJ's RFC finding failed to reflect the
physical limitations associated with her ankle impairment and
was unsupported by a physical RFC from an acceptable medical
source. (Docket Entry # 17). Instead, the ALJ purportedly
interpreted the raw medical data regarding her functional
limitations. (Docket Entry ## 17 & 23).

At step two, the ALJ found there was no evidentiary support
for plaintiff's claim that her right ankle injury limited her
ability to perform basic work activities. He explained that:

    [T]he record does not contain sufficient evidence to
    support the claimant's allegation that her ankle more than
    minimally affects her ability to work. Contrarily, the
    record reflects that when the claimant alleged an ankle
    fracture, an [X]-ray revealed no such fracture (Exhibit 13
    F). The claimant was prescribed ibuprofen and an air cast,
    as well as advised to wear shoes with better support (Id.).

Given the nature of the alleged impairment, I find that it cannot be expected to more than minimally affect the claimant's ability to work.

(Tr. 13).

The step two analysis assesses "the medical severity of [a claimant's] impairment(s)." 20 C.F.R. § 916.920(4). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c) (claimant lacks severe impairment if she does "not have any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities"). In making the severity determination, the Commissioner does "not consider [the claimant's] age, education, and work experience." 20 C.F.R. § 416.920(c). Basic work activities consist of an ability and aptitude "necessary to do most jobs" such as the physical functions of "walking, standing, sitting [and] lifting." 20 C.F.R. § 416.921(b); Gonzalez-Ayala v. Sec'y of Health and Human Servs., 807 F.2d 255, 256 (1st Cir. 1986) (ALJ used "correct definitional framework for determining" severity, "i.e., whether the impairment or combination of impairments significantly limited the claimant's ability to perform basic work activities such as walking, standing, sitting, lifting or carrying").

Step two is "designed to do no more than screen out groundless claims." McDonald v. Sec'y of Health and Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986) (citing Social Security Ruling ("SSR") 85-28). A denial of benefits at step two is appropriate when the "'medical evidence established only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on the claimant's ability to work even if the individual's age, education, or work experience were specifically considered.'" Gonzalez-Ayala v. Sec'y of Health and Human Servs., 807 F.2d at 256 (quoting McDonald v. Sec'y of Health and Human Servs., 795 F.2d at 1124) (brackets and ellipses omitted). The analysis does not "preclude the Secretary from using medical factors alone to screen out applicants whose impairments are so minimal that, as a matter of common sense, they are clearly not disabled from gainful employment." McDonald v. Sec'y of Health and Human Servs., 795 F.2d at 1122; accord Gonzalez Garcia v. Sec'y of Health and Human Servs., 835 F.2d 1, 2 (1st Cir. 1987) (SSR 85-28 allows non-severe impairment finding "where 'medical evidence establishes only a slight abnormality . . . which would have no more than a minimal effect on an individual's ability to work'"). Hence, the fact that the ALJ relied primarily on the medical evidence regarding the January 2012 X-ray, ordered by Dr. Berger (Tr. 845-46), and the resulting treatment plans

prescribed by Dr. Berger and Dr. Hollett does not invalidate his ultimate decision. (Tr. 808). To the contrary, as elaborated below, such medical evidence provides substantial evidence for the ALJ's step two finding.

Plaintiff also complains that the ALJ "fashioned his RFC finding unsupported by any physical RFC evaluation by an acceptable medical source" and substituted "his lay interpretations of medical evidence" regarding plaintiff's right ankle injury. (Docket Entry # 17, p. 5) (Docket Entry # 23, pp. 2-4). Plaintiff is correct in noting that an ALJ is "not qualified to interpret raw medical data in functional terms" and that an ALJ's RFC cannot stand when "no medical opinion support[s] the determination." Nguyen v. Chater, 172 F.3d at 35; (Docket Entry # 17, p. 6). The argument nevertheless fails because there is ample medical evidence to support the ALJ's finding. Both Dr. Esdale and Dr. Hollett treated plaintiff for her ankle pain. Notes made by both physicians indicate that there was no trauma, swelling or lack of mobility in plaintiff's ankle. In fact, upon examination Dr. Hollett found that plaintiff's ankle had a full range of motion. She diagnosed plaintiff as having an ankle sprain and ordered physical therapy. The January 2012 X-ray did not show a fracture. The medical evidence therefore showed relatively little physical impairment.

Under similar circumstances, the First Circuit rejected an argument that the ALJ impermissibly interpreted raw medical data in arriving at an RFC because the medical evidence to support an ankle injury showed little physical impairment. Stephens v. Barnhart, 2002 WL 31474176, at *3 (1st Cir. Nov. 5, 2002) (unpublished).[6] In fact, the Stephens decision upheld the ALJ's assessment that the claimant could perform medium work even though an examining physician's RFC stated that the claimant could only lift ten pounds frequently and 20 pounds occasionally. Id. As explained in Stephens:

> [T]he medical evidence indicates that (1) Stephens' ankle fracture completely healed without complication, (2) his pain was caused by weather rather than exertion, and (3) his pain was controlled by over-the-counter medications. Although Stephens suggests that reading the evidence in this way constitutes an impermissible lay interpretation of raw medical data, see Perez v. Secretary of Health & Human Servs., 958 F.2d 445, 446 (1st Cir. 1991), this prohibition does not apply where the medical evidence shows relatively little physical impairment.

Id.

Plaintiff's assertion that the ALJ ignored the ankle injury in arriving at the RFC is also misguided. Social Security Ruling 96-8P, 1996 WL 374184, at *5 (July 2, 1996), instructs that the ALJ "must consider limitations and restrictions imposed

---

[6]    Under First Circuit Local Rule 32.1, a court may cite to unpublished opinions "regardless of the date of issuance." First Cir. R. 32.1.  A court may only consider unpublished opinions "for their persuasive value" and "not as binding precedent."  First Cir. R. 32.1.

by all of an individual's impairments, even those that are not 'severe.'" See also Chabot v. U.S. Social Sec. Admin., 2014 WL 2106498, at *10 (D.N.H. May 20, 2014) (rejecting argument that ALJ failed to consider non-severe impairment at step two in arriving at the RFC); 20 C.F.R. § 416.945. Here, the ALJ considered the non-severe ankle impairment in arriving at the RFC. In fact, he extensively discussed the "ankle problem" in arriving at the RFC. (Tr. 16); see, e.g., Majors v. Colvin, 2014 WL 551019, at *7 (D.Mass. Feb. 7, 2014) ("ALJ clearly considered Plaintiff's spinal issues," deemed non-severe at step two, "when assessing her RFC" as shown by ALJ's extensive discussion of the impairment and his reliance on MRI report). The relevant section of the ALJ's opinion also states that he carefully considered "the entire record." (Tr. 15). As explained above, the objective medical evidence coupled with other evidence described below provides substantial evidence to support the ALJ's finding that plaintiff had the functional capacity to perform medium work when limited to the performance of simple routine and repetitive tasks.

Plaintiff also argues that the ALJ based his finding of a non-severe ankle injury on the assumption that the X-ray taken of plaintiff's ankle refutes her claim that she suffered a prior ankle fracture. She contends that the radiologist did not express an opinion about a prior ankle injury and, therefore,

the X-ray does not support the ALJ's conclusion of a non-severe impairment. When discussing plaintiff's alleged right ankle fracture and injury, the ALJ noted that the January 2012 "X-ray revealed no such fracture." (Tr. 13). The radiologist's January 25, 2012 report states "no evidence for acute fracture" and "[n]o ankle fracture seen." (Tr. 812). One week later, Dr. Hollett described the X-ray as normal. (Tr. 807). Plaintiff's contention that the ALJ "incorrectly determined that an earlier X-ray 'revealed no such fracture'" (Docket Entry # 17, p. 5) is therefore not an accurate portrayal of the decision or the medical record. The ALJ determined that plaintiff's ankle impairment was "non-severe" and that the record did not support her allegation that the "ankle more than minimally affect[ed] her ability to work." (Tr. 13). Substantial evidence supports the finding that the injury was a non-severe impairment that did not significantly limit plaintiff's ability to perform basic work activities.

In making a disability determination, the ALJ must reconcile any conflicts of evidence. See Richardson v. Perales, 402 U.S. at 399; see also Irlanda Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). Reconciling conflicts of evidence not only includes looking at the medical evidence but also "determin[ing] issues of credibility and

draw[ing] inferences from the record." _Irlanda Ortiz v. Sec'y of Health and Human Servs._, 955 F.2d at 769.

Plaintiff's treatment history conflicts with her testimony that the ankle injury materially limits her ability to continue working. (Tr. 27, 34-35, 45). Plaintiff complained to her primary care physician of right ankle pain in May 2007. (Tr. 249). The physician's treatment notes indicate no trauma or redness, only mild swelling. (Tr. 249). It was not until January 25, 2012, almost five years later, that plaintiff again complained of right ankle pain. (Tr. 845). Meanwhile, she continued to work as a cashier at a convenience store, a waitress and a cashier at a supermarket. (Tr. 156, 163). An X-ray taken on January 25, 2012, revealed no abnormalities. (Tr. 845). Plaintiff herself informed the treating staff that she would not need a cane or walker to assist her. (Tr. 845). Moreover, treatment notes by Dr. Hollett one week later show plaintiff had full range of motion, no instability and no swelling. (Tr. 808).

Despite the evidence present in her treatment history, plaintiff asserts that she has a history of chronic right ankle pain. (Docket Entry ## 17, 23). Dr. Hollett's chart note under the caption "History of Present Illness" states, "R ankle pain, chronic: pt reports stepping in a hole with high heels on [or]

about 7 years ago and experiencing severe pain afterwards, but never seeking care." (Tr. 807).

It is true that complaints of pain "need not be precisely corroborated by objective findings." Dupuis v. Sec'y of Health and Human Servs., 869 F.2d 622, 623 (1st Cir. 1989). Nonetheless, such complaints "need not be accepted to the extent they are inconsistent with the available evidence." Mickles v. Shalala, 29 F.3d 918, 927 (4th Cir. 1994). Plaintiff's ankle complaints are not supported by and are inconsistent with the evidence available. Although Dr. Hollett's note depicting the history of the injury uses the word "chronic" to describe the pain, plaintiff's testimony establishes that she is able to walk half a mile without difficulty. (Tr. 34-35). Moreover, she reported to the ALJ that she does not need a cane or a walker and does not have any trouble sitting, bending or stooping. (Tr. 35). When asked how much she thought she could lift, plaintiff told the ALJ she could lift approximately 25 pounds without trouble. (Tr. 35). Plaintiff also stated that she had a gym membership and enjoys doing light exercise. (Tr. 36). Beyond light exercise, plaintiff is capable of taking care of her children and takes them to the park. (Tr. 50). Plaintiff also testified that she performs a number of household chores, such as sweeping, vacuuming, washing dishes and making the bed.

(Tr. 38-39).  The ALJ noted all of these activities in his opinion.  (Tr. 16).

In assessing a claimant's pain and intensity of that pain, the ALJ considers whether these and other symptoms "can reasonably be accepted as consistent with the objective medical evidence, and other evidence."  20 C.F.R. § 416.929.  "Other evidence" includes a claimant's statements and testimony as well as a claimant's "daily activities, efforts to work, and any other evidence showing how [the claimant's] impairment(s) and any related symptoms affect [the claimant's] ability to work."  20 C.F.R. § 416.929.  "[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Secretary], not for the doctors or for the courts."  Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The foregoing substantial evidence fully supports the ALJ's determination at step two regarding the ankle injury and the ALJ's RFC findings at step four.

B.  Mental Limitations

Plaintiff challenges the ALJ's assessment of plaintiff's mental RFC in three respects.  First, plaintiff argues that the ALJ's RFC failed to take into account the finding of a moderate limitation in concentration, persistence or pace.  Plaintiff maintains that the ALJ's limitation to simple routine and

repetitive tasks does not encompass plaintiff's moderate difficulties in concentration, persistence or pace. In a related argument, plaintiff submits that the ALJ's hypothetical question failed to account for plaintiff's documented limitations in concentration, persistence or pace. Second, the ALJ erred in failing to address the March 2006 DES evaluation that found plaintiff met the criteria for an affective disorder and was therefore disabled.[7] (Docket Entry # 17, p. 8). Third, the ALJ erred by not including a consideration of plaintiff's social limitations, as determined by Dr. Menken. (Docket Entry # 17 p. 9). As discussed below, plaintiff's arguments fail.

Turning to the first argument, plaintiff contends that the ALJ's determination that plaintiff is limited to simple, routine and repetitive tasks does not adequately account for her limitation in concentration, persistence or pace. The argument is not persuasive.

During the administrative hearing, the ALJ asked the VE whether or not plaintiff could work if she was "limited to performing simple, routine, repetitive tasks." (Tr. 56). The VE testified that plaintiff could work under those circumstances

---

[7] Plaintiff's reply brief incorrectly asserts that Michael Sperber, M.D. completed the March 2006 DES evaluation. (Docket Entry # 23, p. 5, n.1). In fact, a licensed clinical social worker, Pat Gaucher ("Gaucher"), and a physician advisor whose signature is illegible signed the March 2006 evaluation. (Tr. 560).

and, in particular, that she could work as a cleaner, a counter attendant and a cashier. (Tr. 56-57). Another hypothetical asked the VE to assume that plaintiff was limited to being able to understand, remember simple information and perform simple tasks for a two hour time period. (Tr. 57). The VE replied that plaintiff could still work. (Tr. 58). The hypothetical questions therefore adequately captured plaintiff's moderate difficulties with respect to concentration by querying her ability to understand and remember simple information for a two hour period.[8] The hypothetical questions also captured plaintiff's moderate difficulties in persistence and pace by asking the VE to assume that plaintiff could "*perform* simple tasks" for a two hour time period.[9] (Tr. 57) (emphasis added). Limiting the hypothetical posed to the VE to being able to perform simple tasks thereby captures the ability to maintain persistence and pace for a two hour time period at work.[10] <u>See generally</u> <u>White v. Comm'r of Soc. Sec.</u>, 572 F.3d 272, 288 (6th

---

[8]  The mental RFC noted that plaintiff "would be able to understand & remember simple information adequately." (Tr. 360).

[9]  Similarly, the mental RFC by Dr. Menken stated that plaintiff "would be able to sustain attention, persistence, & pace adequately to perform simple tasks for 2-hour periods during the course of a normal workday." (Tr. 360).

[10]  As indicated above and in the previous two footnotes, the medical record supported the inputs into both hypotheticals posed to the VE. <u>See</u> <u>Arocho v. Secretary of Health and Human Services</u>, 670 F.2d 374, 375 (1st Cir. 1982).

Cir. 2009); Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002).

Further, at the hearing, plaintiff's attorney pointed out that the VE's answer that plaintiff could work for two hour time periods does not address "how long she has to stop." (Tr. 58). The ALJ then asked plaintiff's counsel how long he thought plaintiff needed "to stop for and what evidence do we have to support that?" (Tr. 58). Plaintiff's counsel only replied that the evidence was "inferential." (Tr. 15). The VE then continued to testify that most unskilled jobs have a 15 minute break in the morning and another 15 minute break in the afternoon. He did not change his opinions that plaintiff could work at the jobs he identified.

Notably, in crafting the RFC, the ALJ expressly relied upon and recited Dr. Menken's finding that plaintiff was moderately limited in maintaining concentration, persistence or pace under the paragraph B criteria and that she had no episodes of decompensation under the paragraph C criteria. (Tr. 19, 372). He also relied on her finding in the mental RFC that plaintiff could understand and remember simple information and could sustain attention, persistence or pace to perform simple tasks for two hour time periods during the workday. (Tr. 19, 360).

Dr. Menken's November 2010 functional capacity assessment in the mental RFC explains the basis of her findings, i.e., that

recent notes from CAB "indicate improvement in [claimant's] mood symptoms with medication." (Tr. 360). The medical record supports the basis for Dr. Menken's assessment. (Tr. 326, 354, 636). O'Neill's treatment notes reflect plaintiff's decreased symptoms of anxiety and that her medications appeared to be working.

Medical evidence after Dr. Menken's assessment shows that the basis for Dr. Menken's mental RFC remained well founded. Although plaintiff struggled with depression in early 2011, her condition was improving by May 2011. (Tr. 661, 668). Dr. Anscombe, plaintiff's treating psychiatrist, assessed plaintiff as "doing well on current medications" in December 2011 (Tr. 868), a fact pointed out by the ALJ (Tr. 17). In the same treatment note, Dr. Anscombe characterizes plaintiff's mood as "Normal (bright)," her thought process "Logical," her judgment "Good" and her insight "Good." (Tr. 868).

In short, plaintiff's position that the ALJ's RFC did not account for plaintiff's moderate limitations in concentration, persistence or pace does not accurately portray the record. The hypotheticals were appropriate and substantial evidence supports the ALJ's RFC finding. (Tr. 15). Plaintiff's first argument therefore fails to warrant a remand or reversal of the Commissioner's decision.

In the alternative, it is debatable whether the RFC must necessarily include the paragraph B criteria of moderate difficulties in concentration, persistence or pace that an ALJ determines at step three. An RFC is defined as "the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. § 416.945. The ALJ's finding at step three entails a psychiatric review technique form ("PRTF") requiring an assessment of the paragraph B criteria which include concentration, persistence or pace. Here, Dr. Menken completed the requisite form (Tr. 362-375) and Dr. Fiore affirmed the finding (Tr. 409). "[T]he 'paragraph B' criteria," however, "does not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment." Beasley v. Colvin, 2013 WL 1443761, at *5 (10th Cir. April 10, 2013) (unpublished); see Fed.R.App.Pro. 32.1 (allowing citations of unpublished opinions issued on or after January 1, 2007). In any event, even if this court accepts that "the mental RFC findings typically should reflect, and be consistent with, the degree of impairment found by way of use of a PRTF," McHugh v. Astrue, 2009 WL 5218059, 4 (D.Me. Dec. 30, 2009), here they are consistent as discussed above.

Plaintiff's second argument is that the ALJ erred in failing to address the findings from the March 2006 DES evaluation done in connection with plaintiff's application for

financial and medical assistance from the Massachusetts
Department of Transitional Assistance. (Tr. 560-568). Gaucher,
a nontreating medical source, see 20 C.F.R. § 416.927(c)(2),
completed the form in question and found that plaintiff met the
criteria for an affective disorder and was therefore disabled.
A nonexamining physician advisor signed the form one week after
Gaucher signed it.

It is well settled that an ALJ may not make factual
findings by ignoring evidence. See Nguyen v. Chater, 172 F.3d
at 35. The failure to address certain evidence however will not
undermine an ALJ's conclusion "'when that conclusion was
supported by citations to substantial medical evidence in the
record and the unaddressed evidence was either cumulative of the
evidence discussed by the [ALJ] or otherwise failed to support
the claimant's position.'" Coggon v. Barnhart, 354 F.Supp.2d.
40, 55 (D.Mass. 2005) (quoting Lord v. Apfel, 114 F.Supp.2d 3,
13 (D.N.H. 2000)).

As previously indicated, the ALJ's conclusion that
plaintiff is not disabled based on her impairments is supported
by citations to substantial medical evidence in the record.
Both Dr. Menken and Dr. Fiore found that plaintiff's mental
impairments did not satisfy the criteria for an affective or
anxiety related disorder. (Tr. 14, 372, 409). Moreover, the
ALJ discussed plaintiff's own testimony at length in

establishing that she has only moderate restrictions in daily
activities, concentration, persistence or pace and mild
limitation in social functioning.  (Tr. 14, 18-19).
Furthermore, the ALJ expressly stated that he considered "the
entire record" (Tr. 13, 15), which included Gaucher's March 6,
2006 finding.  "An ALJ can consider all the evidence without
directly addressing in his written decision every piece of
evidence submitted by a party."  NLRB v. Beverly Enterprise-
Massachusetts, Inc., 174 F.3d 13, 26 (1st Cir. 1999).  The ALJ's
failure to refer to Gaucher's 2006 finding does not necessarily
mean that he did not consider it.

Additionally, the DES evaluation form does not appreciably
support plaintiff's position.  See Coggon v. Barnhart, 354
F.Supp.2d at 55.  Moreover, "The determination of disability is
left to the [ALJ], and the opinion of an individual physician
stating that a claimant is 'disabled' is in no way binding."
Id. at 55-56.  The DES evaluation was performed on March 13,
2006, almost two years before plaintiff's alleged disability
began on January 1, 2008, more than four years before plaintiff
stopped working completely in August 2010 and nearly six years
before the ALJ hearing.  (Tr. 11, 22, 155, 560).  It is
reasonable for an ALJ to conclude that "[a] more recent
assessment of plaintiff's mental health would be far more
probative than considerably outdated information."  Martinez v.

Astrue, 2013 WL 4010507, at *11 (D.Mass. Aug. 2, 2013).
Finally, the fact that plaintiff continued to work after the
March 2006 assessment determined plaintiff was disabled warrants
discounting the DES evaluation.  Indeed, despite "marked"
disabilities, plaintiff held various jobs including working at a
convenience store, a restaurant and a grocery store from
September 2008 through August 2010.  (Tr. 155, 163).  For these
reasons, it was reasonable for the ALJ not to expressly address
the 2006 opinion.

Plaintiff next insists the ALJ erred by not including any
social limitations in his RFC assessment and his hypothetical
question to the VE.  (Docket Entry # 17, p. 9).  In section I(c)
of the November 2010 mental RFC completed by Dr. Menken, she
checked two boxes indicating that the plaintiff was "moderately
limited" in her "ability to accept instructions and respond
appropriately to criticism from supervisors" and in her "ability
to get along with coworkers or peers without distracting them or
exhibiting behavioral extremes." (Tr. 359).  In the PRTF
completed the same day, Dr. Menken checked the box indicating
that plaintiff exhibited "moderate difficulties in maintaining
social functioning." (Tr. 372).  The narrative portion of the
mental RFC in section III, however, details plaintiff's ability
to understand and remember simple information and her ability to
sustain attention, persistence and "pace adequately to perform

37

simple tasks" for two hour time periods during a normal workday. (Tr. 360). Significantly, Dr. Menken also states that plaintiff "would be able to manage basic, work-related social interactions with supervisors [and] coworkers adequately. (Tr. 360).

The ALJ considered Dr. Menken's finding that plaintiff was moderately limited in maintaining social functioning because he expressly referred to it in the opinion when discussing plaintiff's RFC. (Tr. 19). He also expressly referenced Dr. Menken's narrative finding that plaintiff "could manage basic work related social interactions with her supervisors and co-workers." (Tr. 19). "Basic work activities" include the ability to "[r]espond[] appropriately to supervision, co-workers and usual work situations." 20 C.F.R. § 416.921(b)(5). Dr. Menken therefore did not impose specific social limitations on plaintiff's ability to work. In the narrative, Dr. Menken did limit plaintiff's functional assessment to performing simple tasks and the ALJ included this limitation in the RFC.

The Social Security Administration's Program Operations Manual ("POM") instructs the ALJ to use the narrative in section III as opposed to the checked boxes in section I to arrive at the RFC. In no uncertain terms, the POM states that:

> The purpose of section I ("Summary Conclusion") [of the mental RFC form] is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation for sustaining these

38

activities over a normal workday and workweek on an
ongoing, appropriate, and independent basis. *It is the
narrative written by the psychiatrist or psychologist in
section III ("Functional Capacity Assessment") of [the
mental RFC form] that adjudicators are to use as the
assessment of RFC.* Adjudicators must take the RFC
assessment in section III and decide what significance the
elements discussed in this RFC assessment have in terms of
the person's ability to meet the mental demands of past
work or other work.

POM, https://secure.ssa.gov/poms.nsf/lnx/0425020010 (emphasis

added).  The ALJ is therefore "under no obligation to accept the

'check-box conclusions' found in Section I of the Mental RFC

form."  Pippen v. Astrue, 2010 WL 3656002, at *6 (W.D.N.C. Aug.

24, 2010).  Rather, "The criteria found in Section I of the form

should be used to provide a more detailed assessment of RFC in

Section III of the form."  Id.

Here, the ALJ appropriately relied on Dr. Menken's

narrative in her section III assessment of plaintiff's

functional capacity.  Therein, Dr. Menken noted that plaintiff

could manage "basic, work-related social interactions with

supervision and coworkers."  (Tr. 360).  Nowhere in Dr. Menken's

mental RFC narrative does she state that plaintiff's social

limitations would limit her ability to work.  Moreover, Dr.

Fiore's review of Dr. Menken's findings found that no revisions

of Dr. Menken's mental RFC were warranted.  (Tr. 409).

Therefore, the ALJ's omission of any reference to plaintiff's

social functioning in the RFC assessment was appropriate and supported by substantial evidence in the record.

CONCLUSION

In accordance with the foregoing discussion, the motion to reverse the decision of the Commissioner (Docket Entry # 17) is **DENIED** and the motion to affirm the decision of the Commissioner (Docket Entry # 21) is **ALLOWED**.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge